```
                 IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF PENNSYLVANIA


ANDREW P. BRONSON,                  :    CIVIL ACTION
                                    :    NO. 17-0114
         Plaintiff,                 :
                                    :
     v.                             :
                                    :
SOUTHEASTERN PA TRANS.              :
AUTHORITY (SEPTA),                  :
                                    :
         Defendant.                 :
```

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                          March 23, 2018

Plaintiff Andrew Bronson brings this unlawful termination suit against Southeastern Pennsylvania Transportation Authority ("SEPTA") under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12112-12117, and the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 et seq. See Compl. at 1, ECF No. 3. SEPTA has moved for summary judgment on all claims. For the reasons discussed below, the Court will grant SEPTA's motion for summary judgment as to all counts.

I.  **FACTUAL BACKGROUND**[1]

Bronson was employed by SEPTA as a train operator for approximately ten years before his employment was terminated on September 8, 2015. Id. at 6. During that time, Bronson was disciplined several times for substandard attendance. He also violated train traffic signals on four occasions. On that basis, SEPTA terminated Bronson's employment. Bronson, who suffers from depression and generalized anxiety disorder, argues that "the reason provided by [SEPTA] for its termination of Plaintiff was merely pretext for terminating his employment because of his disabilities," and further that his termination was "in violation of the FMLA." Id.

Bronson began working at SEPTA as a bus driver on September 19, 2005. Statement of Uncontested Material Facts ("SOF") ¶ 1, ECF No. 18. On July 22, 2012, he transferred to a train operator position. Id. at ¶ 2. While he was a bus driver, Bronson alleges that SEPTA discriminated against him on account of his alleged disabilities by: (a) assessing him "points" under an attendance policy for unauthorized absences when he was attending counselling sessions and (b) not authorizing an absence to attend a counselling session on one occasion. See Compl. ¶¶ 6-15, 25-27; see also April 19, 2017 deposition

---

[1] The facts are presented in the light most favorable to Plaintiff, the non-moving party.

transcript of Plaintiff ("Bronson Tr.") at 216:3-222:17, ECF No. 18-2.

Bronson claims that, in 2012, his disabilities became "aggravated . . . due to work and family stress." Id. He thereafter sought therapeutic treatment from Life Counseling Services while continuing to "effectively perform the duties of his position with SEPTA." Id. Bronson claims that he explained to his supervisors that he would be intermittently absent from work so that he could treat his disability with therapy sessions at life counseling." Id. Despite this notification, Bronson claims that he was disciplined for substandard attendance. Id. These incidents, described in the Complaint, occurred on October 8, 2012; January 17, 2013; and April 9, 2013.

Beginning on July 22, 2012, Bronson was transferred to SEPTA's Fern Rock Transportation Center to work as a train operator. Id. at ¶ 14. Between the date of the transfer and April 9, 2013, the date of his last discipline, Bronson was disciplined four times for excessive absences. Id. at ¶ 16. Further, on three occasions, he was orally warned about his excessive absences, and on one occasion he served a one-day administrative suspension. Id. at ¶ 17.

Bronson claims that he was missing work to attend counselling sessions during the period of time when he was being disciplined for excessive absences. Bronson Tr. 209:4-15. He has

3

put forth no evidence, however, that he notified SEPTA during the July 22, 2012 to April 9, 2013 time period that he was seeking leave to attend counselling sessions.

Even though SEPTA provides employees such as Bronson with notice of their FMLA rights through numerous forums, including through the parties' Collective Bargaining Agreement ("CBA") a copy of which Bronson acknowledged receiving, he claims that he was unaware that he might have been eligible to take leave pursuant to the FMLA until 2014. See Def. Mot. at Ex. D., ECF No. 18-2; see also Bronson Tr. 26:6-17; 227:13 to 228:4; Compl. ¶ 16.

Bronson first applied for FMLA leave on June 23, 2014, but his application was denied because he failed to provide the required medical certification. SOF ¶ 18. Bronson then re-applied for FMLA leave, this time providing the required certification. Id. at ¶ 19. Upon receiving his completed application, SEPTA's third-party FMLA vendor approved Bronson to use intermittent leave from September 19, 2014 to March 15, 2015. Id. at ¶ 20.

Bronson's first signal violation occurred on November 19, 2012, when he drove a subway train through a stop signal while transporting passengers. Id. at ¶ 33. An automatic safety feature caused the train to "go into emergency," meaning the train came to a halt. Id. at ¶ 34. As a result of that

4

violation, SEPTA sought to impose a five-day suspension on Bronson. Id. at ¶ 35. After the violation and discipline were reviewed with Bronson and a Union representative at an Informal Hearing, Bronson accepted the discipline and declined to pursue his grievance any further. Id. at ¶¶ 36, 37.

The second signal violation occurred on November 14, 2013, when Bronson drove his train through a red signal as he was approaching a station, again causing his train to go into emergency. Id. at ¶ 38. As a result of that violation, SEPTA sought to suspend Bronson for ten days. Id. at ¶ 39. Bronson disputed that violation finding through all four stages of the grievance process. Id. at ¶ 40. At each step of the grievance process, the discipline was upheld, culminating with a neutral arbitrator upholding the discipline. Id. at ¶ 41. After the second signal violation, Bronson's supervisor provided him with oral coaching recommending that he slow down while driving the train, even if that meant the train would be late in arriving to the next station. Id. at ¶ 42.

The third signal violation occurred on June 12, 2014, when Bronson again drove a train through another stop signal. Id. at ¶ 43. As a result of that violation, SEPTA sought to terminate Plaintiff's employment. Id. at ¶ 44. Bronson testified at his deposition that there was no exculpatory or mitigating

5

explanation for why he violated the signal on this occasion. Id. at ¶ 45.

After the Informal Hearing for the third signal violation, during which Bronson's Union indicated that it would not be contesting the underlying merits of the violation, Union Representative Keith Swaby advised Bronson during a phone call that his employment would be terminated unless he signed a Last Chance Agreement. Id. at ¶ 46. Swaby reviewed the substantive terms of the Agreement with Bronson during their phone call. Id. at ¶ 47. Then, on August 14, 2014, SEPTA and Bronson entered into the Last Chance Agreement. Id. at ¶ 48.

The fourth signal violation occurred on September 8, 2015, when Bronson attempted to start driving his train towards a passenger platform despite the controlling signal not authorizing him to proceed forward. Id. at ¶ 61. At the time, Bronson's train was located in a "spur," which is an area where a train stops to change direction. Id. at ¶ 62. Before exiting the spur, a train operator must wait for a green signal, which the train operator requests by pushing a button located in the spur. Id. at ¶ 63. Bronson testified at his deposition that while he pushed the button to "clear the signal," he never saw the signal turn from red to green before starting to drive the train away from the spur. Id. at ¶ 64. His train went into

6

emergency because the signal had not turned from red to green. Id. at ¶ 65.

As a result of that violation, SEPTA immediately barred Bronson from reporting to work while it sought to terminate his employment. Id. at ¶ 69. The Union initiated a grievance proceeding challenging SEPTA's plan to terminate Bronson's employment. Id. at ¶ 70. At the September 14, 2015 Informal Hearing, Swaby advised SEPTA that, although there was "no defense" to the alleged signal violation, the Union was requesting a Formal Hearing on the proposed termination. Id. at ¶ 71.

The Formal Hearing was held on October 7, 2015, during which Bronson testified that he "attempted to key his way out to proceed to the platform" and that the signal "usually clears." Id. at ¶ 72. Following the Formal Hearing, the hearing officer issued a written report noting that neither Bronson nor the Union had put forth any evidence to dispute the fact that Bronson had disobeyed the signal. Id. at ¶ 73. As a result, the hearing officer advised that SEPTA would move forward with terminating Bronson's employment. Id. at ¶ 74.

Then, the Union requested a Labor Relations Step Hearing, which occurred on October 22, 2015. Id. at ¶ 75. At that hearing, Bronson testified that "the train went into emergency and he did not know the reason for this occurring."

Id. at ¶ 76. A hearing officer reviewed the evidence and concluded that the violation occurred and that the discipline would be upheld. Id. at ¶ 77. At the conclusion of the Labor Relations Step Hearing, SEPTA formally terminated Bronson's employment. Id. at ¶ 78.

**II.   PROCEDURAL HISTORY**

Bronson filed a charge of discrimination with the EEOC on or around July 5, 2016, approximately nine months after his employment was terminated. See Def. Mot. Ex. Y, ECF No. 18-5. Bronson received a Right to Sue Notification from the EEOC on October 13, 2016 and initiated this action on January 8, 2017. SEPTA filed its motion for summary judgment on May 20, 2017. ECF No. 18. Bronson filed his response on July 6, 2017. ECF No. 22.

**III. LEGAL STANDARD**

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)). A

fact is "material" if proof of its existence or nonexistence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

The Court will view the facts in the light most favorable to the nonmoving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth., 593 F.3d 265, 268 (3d Cir. 2010). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the nonmoving party who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

**IV. ANALYSIS**

    A.   ADA Claims

It is not entirely clear whether Bronson's ADA claims are based on alleged disparate treatment or failure to accommodate. Still, in any event, they are time-barred. To bring suit under the ADA, a plaintiff must file a claim with the EEOC "within three hundred days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1).

In this case, Bronson was disciplined for excessive absences on October 8, 2012; January 17, 2013; February 1, 2013; and April 9, 2013. See Compl. ¶¶ 11-14. He did not file a charge of discrimination with the EEOC, however, until July 5, 2016. Because Bronson's claim is based exclusively upon actions that occurred over three years before he filed his charge of discrimination with the EEOC, he has failed to comply with this provision and his claims are time-barred.

B.  FMLA Claims

Similarly, any FMLA claim Bronson might have is time-barred because the events upon which Bronson relies as support for his FMLA claim occurred in 2012 and 2013. The FMLA has a two-year statute of limitations and Bronson did not file this lawsuit until January 8, 2017. See Def. Mot. at 27 (citing 29 U.S.C. § 2617(c)). Insofar as Bronson claims that SEPTA never informed him of his FMLA rights, SEPTA points to "clear evidence that SEPTA provided Mr. Bronson with notice of his FMLA rights," including the following:

> 1) The CBA contains a notification about an employee's FMLA rights, and Plaintiff acknowledged receiving copies of the CBA in connection with his employment;
>
> 2) SEPTA posted information about its FMLA policy on its intranet, which Plaintiff had the ability to access; and

10

3) SEPTA posted "conspicuous signs" advising employees about their FMLA rights and who they should contact if they need to request FMLA leave.

Id.

As SEPTA correctly notes, "[e]ven if the Court accepts that Mr. Bronson did not learn of his FMLA rights until 2014, once he applied for intermittent FMLA leave on June 23, 2014, he had knowledge of his rights"--and yet he still waited over two and a half years after this point to file the instant lawsuit. Id. at 28 (citing Bronson Tr. 227:13-228:14).

### V. CONCLUSION

For the reasons discussed above, the Court will grant SEPTA's motion for summary judgment as to all counts.

An appropriate order follows.